# 22-2323

*To be argued by:* JEREMIAH DONOVAN

IN THE

# United States Court of Appeals
# For the Second Circuit

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

RAUL ROMERO-GRANADOS, AKA CHICARCAS, AKA EL NEGRO, ISAAC LOMELI-RIVERA, AKA GIRO, JUAN ROMERO-GRANADOS, AKA CHEGOYA, AKA EL GUERO, ALAN ROMERO-GRANADOS, AKA EL FLACO, PEDRO ROJAS-ROMERO, EMILIO ROJAS-ROMERO, JULIO SAINZ-FLORES, AKA ROGELIO,

*Defendants*,

EFRAIN GRANADOS-CORONA, AKA CHAVITO, AKA CEPILLO,

*Defendant - Appellant.*

**On Appeal from the United States District Court for the Southern District of New York**

**BRIEF OF DEFENDANT-APPELLANT EFRAIN GRANADOS-CORONA**

JEREMIAH DONOVAN
*Counsel For Defendant-Appellant*
P.O. Box 554
123 Elm Street
Old Saybrook, CT 06475
(860) 388-3750
FAX 388-3181

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Factual background of underlying offense . . . . . . . . . . . . . . . . . . . . . . . . . 4
        Victim 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        Victim 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Victim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Calculation of the Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . 18

    The sentencing proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    1. The Court should not enforce the appeal waiver of the plea agreement.
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        Factual and procedural background . . . . . . . . . . . . . . . . . . . . . . . . . 25
            The plea agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
            The guilty plea proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        Contractual invalidity: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        Various constitutional defects . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

Appellate waivers strictly construed . . . . . . . . . . . . . . . . . . . . . . . . 30

Defects in Rule 11 canvass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Overriding public interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Ineffective assistance of counsel . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.  The sentencing court erred in varying downwardly  by only sixteen,
    rather than eighteen, months in order to account for the time Efrain
    Granados-Corona  spent in the custody of Mexican authorities
    awaiting extradition to the United States. . . . . . . . . . . . . . . . . . . . . 34

Factual and procedural background. . . . . . . . . . . . . . . . . . . . . . . . . 34

Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3.  Efrain Granados-Corona received ineffective assistance of counsel. . . 37

Factual and procedural background. . . . . . . . . . . . . . . . . . . . . . . . . 37

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

**CASES**[1]

Anders v. California, 386 U.S. 738 (1967) ............................... 27

Massaro v. United States, 538 U.S. 500, 505  (2003) ...................... 33

Strickland v. Washington, 466 U.S. 668, 687-88 (1984)................... 33

Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000) ............... 32, 33

United States  v. Arevalo, 628 F.3d 93, 98 (2d Cir. 2010) ................. 28

United States v. Adams, 448 F.3d 492, 497 (2d Cir. 2006).............. 29, 30

United States v. Braimah, 3 F.3d 609, 611 (2d Cir.1993) .................. 32

United States v. Brunetti, 376 F.3d 93, 95 (2d Cir. 2004)................. 28

United States v. Burden, 860 F.3d 45, 52 (2d Cir. 2017) ............... 27, 28

United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ......... 35

United States v. Cook, 722 F.3d 477, 480-81 (2d Cir. 2013) ............. 27, 28

United States v. Eaglin, 913 F.3d 88, 94 (2d Cir. 2019) ................... 35

United States v. Gomez-Perez, 215 F.3d 315, 319 (2d Cir. 2000) ...... 27-29, 31

United States v. Goodman, 165 F.3d 169, 174 (2d Cir. 1999) .............. 29

United States v. Jacobson, 15 F.3d 19, 23 (2d Cir.1994) .................. 30

United States v. Johnson, 347 F.3d 412, 415, 419 (2d Cir. 2003)............ 29

United States v. Kimber, 777 F.3d 553, 562 (2d Cir. 2015) ................ 39

United States v. Labeille-Soto, 163 F.3d 93, 99 (2d Cir. 1998) .............. 37

---

[1]    Pursuant to The Blue Book: A Uniform System of Citation, Rule 10.7, this brief's citation of cases does not include *certiorari denied* dispositions that are more than two years old.

iii

United States v. Levy, 377 F.3d 259, 265 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . 33

United States v. Liriano-Blanco, 510 F.3d 168, 172 (2d Cir. 2007) . . . . . . . 29, 30

United States v. Lloyd, 901 F.3d 111, 118 (2d Cir. 2018) . . . . . . . . . . . . . . . 31

United States v. Lutchman, 910 F.3d 33 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . 28

United States v. Martinez-Rios, 143 F.3d 662, 668-69 (2d Cir.1998) . . . . . . . . 29

United States v. Mezzanatto, 513 U.S. 196, 204 (1995) . . . . . . . . . . . . . . . . . 32

United States v. Morris, 350 F.3d 32, 39 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 33

United States v. Oladimeji, 463 F.3d 152, 157 (2d Cir. 2006) . . . . . . . . . . . . . 30

United States v. Ready, 82 F.3d 551, 555 (2d Cir. 1996) . . . . . . . . . . . . 28, 30, 32

United States v. Riggi, 649 F.3d 143, 147 (2d Cir. 2011) . . . . . . . . . . . . 28, 30, 32

United States v. Robinson, 702 F.3d 22, 38 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 36

United States v. Rosa, 123 F.3d 94, 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Salameh, 152 F.3d 88, 160 (2d Cir. 1998) . . . . . . . . . . . . . . . 33

United States v. Salcido-Contreras, 990 F.2d 51 (2d Cir. 1993) . . . . . . . . . . . . . 28

United States v. Singh, 877 F.3d 107, 115 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 36

United States v. Tarbell, 728 F.3d 122, 128 (2d Cir. 2013) . . . . . . . . . . . . . . . 39

United States v. Wilson, 503 U.S. 329, 335 (1992) . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Woltmann, 610 F.3d 37, 39–40 (2d Cir.2010) . . . . . . . . . . 28, 29

United States v. Yemitan, 70 F.3d 746, 747 (2d Cir.1995) . . . . . . . . . . . . . . 28, 29

## STATUTES

18 U.S.C. §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. §1591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. §1591(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 13

18 U.S.C. §2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 7-10, 13

18 U.S.C. §2423(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. §3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §3557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §3585(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. §3585(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. §3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 34, 39

**RULES**

Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 32(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Fed. R. App. P. 32(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Fed. R. App. P. 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**SENTENCING GUIDELINE PROVISIONS**

U.S.S.G. §2G1.1(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S.S.G. §2G1.3(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S.S.G. §2G1.3(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

v

U.S.S.G. §2G1.3(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S.S.G. §3D1.4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. §3E1.1 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. §3E1.1 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## JURISDICTIONAL STATEMENT

The basis for subject matter jurisdiction in the court below is 18 U.S.C. § 3231 (jurisdiction over offenses against the United States).

The basis for the jurisdiction of the court of appeals is 28 U.S.C. § 1291 (appeals from final judgments of district courts), and Rule 4(b), Fed. R. App. Proc. (appeals from criminal convictions), as well as 18 U.S.C. § 3557, and 18 U.S.C. § 3742 (appeals from sentences).

The judgment entered on September 20, 2022. A-097. A timely notice of appeal was filed on September 26, 2022. A-106.

This appeal is from a final judgment in a criminal case, a judgment that disposes of all parties' claims.[2]

_____

[2]The brief adopts the following conventions. "Br." refers to this brief, our principal brief. "A" refers to the appendix that is filed with this brief.

To make the brief more readable, references to the record below are generally made by referring to the Appendix, without a dual citation to the specific document. so long as the source is not obscure or ambiguous. For example, a reference which would appear, if set forth in full, as "Transcript, Vol V (October 12, 2019) at 83, A-077" is set forth simply as "A-077" – so long as it is apparent to the reader that brief is referring to a transcript.

An entry in the district court's ECF docket sheet is referred to as "ECF." The Presentence Investigation Report is sometimes referred to as the "PSR."

This brief omits within direct quotations, without ellipses, all citations to cases and quotation marks within direct quotations, except where the citations or quotations might be helpful to the reader.

## ISSUES PRESENTED FOR REVIEW

1.  Should the Court decline to enforce the appeal waiver of the plea agreement?

2.  Did the district court err in declining to vary downwardly in order to credit Efrain Granados-Corona for the full eighteen months that he spent in the custody of Mexican authorities while awaiting extradition to the United States?

3.  Did Efrain Granados-Corona receive effective assistance of counsel?

## STATEMENT OF THE CASE

Defendant-appellant Efrain Granados-Corona appeals from his sentence after a guilty plea in the Southern District of New York (Andrew L. Carter, Jr., D.J.) (SDNY docket no. 1:16-cr-00324-ALC-1).

Efrain Granados-Corona was charged by indictment, and then by superseding indictment, with:

> • in count one, with conspiring with seven co-defendants to commit sex trafficking, in violation of 18 U.S.C.§1594;
>
> • in count three, with sex trafficking of a minor, whom the indictment called "Victim 10," by force, fraud or coercion, in violation of 18 U.S.C. §1591(a), (b)(1), (b)(2) and 2;
>
> • in count five, with sex trafficking of a minor, whom the indictment called "Victim 1," by force, fraud or coercion, in violation of 18 U.S.C. §1591(a), (b)(1), (b)(2) and 2;

---

As noted at p. iii, n.1, *supra*, pursuant to THE BLUE BOOK: A UNIFORM SYSTEM OF CITATION, Rule 10.7, this brief's citation of cases generally does not include "certiorari denied" dispositions that are more than two years old.

• in count six, with sex trafficking of a minor, whom the indictment called "Victim 2," by force, fraud or coercion, in violation of 18 U.S.C. §1591(a), (b)(1), (b)(2) and 2;

• in count thirteen, with transportation of a minor, whom the indictment called "Victim 10," for purposes of prostitution, in violation of 18 U.S.C. §2423(a) and 2);

• in count seventeen, with transportation of a woman, whom the indictment called "Victim 2" for the purposes of prostitution, in violation of 18 U.S.C. §2241 and 2.

A-023.

On November 1, 2019, Efrain Granados-Corona pleaded guilty to count three of the superseding indictment. He pleaded pursuant to a plea agreement that included an appeal waiver: he would not appeal any sentence of 293 months or less. A-039. (Whether the Court should enforce the waiver is the subject of Argument 1 of this brief.)

There was no disagreement concerning the calculation of the sentencing guidelines. The offense level was 38; the criminal history category was I; and the recommended guideline range was 235-293 months.

Following the preparation of a presentence report and the filing of sentencing memoranda by the defense, A-047, 065, 072, and the prosecution, A-055, Efrain Granados-Corona was sentenced to incarceration of 212 months (17 years and eight months), supervised release for five years, and a $100 special assessment. A-097. The court issued a restitution order in the amount of $2,004,450 and entered an order of judicial removal. A-094.

As noted at p. 1, *supra*, a timely appeal followed.

3

## STATEMENT OF FACTS

*Factual background of underlying offense*: According to the presentence report,[3] Efrain Granados-Corona, along with Juan Romero-Granados, Alan Romero-Granados, Pedro Rojas-Romero, Emilio Rojas-Romero, and Julio Sainz-Flores, was a member of an international sex trafficking organization. Many of the members of the organization are related by blood, marriage, or community. PSR ¶21.

Between 2000 and 2016 (and perhaps even longer, the PSR said), the sex-traffickers had used a variety of tactics, including false promises and pretenses, physical and sexual violence, threats and lies, to coerce women to work as prostitutes in Mexico and the United States. PSR ¶22

In most cases, a trafficker enticed a victim – frequently a minor – in Mexico. The trafficker then used multiple means to isolate the victim from her family. Often, the trafficker used romantic promises to induce the victim to leave her family and live with him. The victims did not know that the traffickers were making similar inducements to other women at the same time. The traffickers frequently lied to the victims. One ruse was claiming to owe a significant debt to dangerous people and telling the victim that they had to work as prostitutes to assist in repaying that debt. Sometimes, the PSR said, the trafficker raped the

---

[3]Neither the government nor the defense contested the assertions of the presentence report and the district court adopted its factual findings. A-137.

4

victim, making it difficult for him or her to return to their family due to the stigma associated with rape. PSR ¶22

Once a victim had been separated from her family, the trafficker frequently monitored her communications, kept her locked in an apartment that was sometimes shared with other traffickers, left her without food, or engaged in physical or sexual violence against her. Usually, a victim began to work in prostitution in Mexico. The victims were, according the PSR, frequently required to service twenty to forty customers per day. Traffickers monitored the number of clients a victim saw by surveilling the victim, communicating with brothel workers, and counting condoms. Traffickers typically required the victims to turn over all of proceeds of their work. *Id.*

The PSR stated that after a victim had worked in prostitution in Mexico for some time, traffickers would arrange for the victim to be smuggled into the United States. The traffickers assisted one another in making smuggling arrangements by paying "coyotes" to smuggle the victims and arranging transport and housing in New York once the victims arrived there. In many cases, multiple traffickers and multiple victims were smuggled into the United States together. In other cases, one trafficker remained in Mexico while arranging for a victim to be smuggled into the United States together with some other trafficker and other victims. PSR ¶24.

Once in the United States, the traffickers would generally install their victims at one of several shared apartments in New York City. Victims living in the same apartment were frequently forbidden to communicate with one another.

5

Once the victims were in the United States, the traffickers continued to use violence, threats and lies to coerce the victims to work as prostitutes. PSR ¶25.

In most cases, the trafficker or another member of the his organization would provide a victim with the contact information they needed to find work. The victims typically worked seven-day-a-week shifts either in a brothel or in a "delivery service." In a delivery service, the victim was delivered to a customer's home by a driver. These brothels and delivery services were located within New York and in surrounding states, including Connecticut, Maryland, Virginia, New Jersey, and Delaware. PSR ¶26.

According to the PSR, during the time frame of the conspiracy, each customer paid $30 to $35 for fifteen minutes of sex. Half of the money went to the driver or to the brothel. The other half went to the victim, who usually was forced to give all of the proceeds to the trafficker. When a trafficker was unavailable, a victim could also give the proceeds to one of his associates.

The traffickers also frequently sent, or had their victims send, some of the prostitution proceeds to traffickers' family members and associates in Mexico by wire transfer. Such transfers provided financial assistance to the traffickers' families and provided financial support to the traffickers themselves when they returned to Mexico. PSR ¶27.

The PSR, "for the sake of brevity," described specifically only the conduct attributed to Efrain Granados-Corona. ¶29.

Efrain Granados-Corona. the PSR said, was one of the senior family

members in the organization. He trained other defendants in the business of sex trafficking and he facilitated other defendants' involvement in trafficking by various means: by paying for other defendants' victims to be smuggled into the United States, by providing housing for them in the United States, and by using victims he controlled to get commercial sex work for other victims. He had specifically trafficked the victims identified in the superseding indictment as victims 1, 2, and 10, as well as others. PSR ¶30.

*Victim 2:* According to the PSR, Efrain Granados-Corona trafficked Victim 2 from 2003 to 2009. PSR ¶31.

Victim 2 met Efrain Granados-Corona through a woman who was with Isaac Lomeli-Rivera, Efrain's nephew. They met at a dance club in Puebla. According to Victim 2, Efrain Granados-Corona drugged and raped her on their third date. *Id.*

After they had dated for approximately a month, Efrain Granados-Corona told her that he had lost his job and that Victim 2 needed to start working. Several days later, he picked her up along with two other women who, he said, said were his cousins. Victim 2 later learned that they were two other victims being forced by Efrain Granados-Coronado engage in commercial sex. Efrain Granados-Corona brought the three women to a bar in San Cosme Tlaxcala, where they were to engage in commercial sex. One of the other women told Victim 2 how much to charge and how to apply condoms. PSR ¶32.

The first day, Victim 2 refused to engage in commercial sex. When Efrain

Granados-Corona found out about her refusal, he beat her badly, she said, with a metal belt buckle. Victim 2 said that she had tried to hide under the bed but was dragged out by her hair and then beaten some more and raped. Efrain Granados-Corona told her that if she did not work, he would beat her worse. That night be brought Victim 2 back to the bar and she met with four or five male customers. When she saw him afterwards, he demanded all the money she made and asked whether she preferred working in prostitution or receiving a beating. PSR ¶32.

Several months later, Victim 2 attempted to hide money from Efrain Granados-Corona.. When he found the money, he beat her and then raped her again. PSR ¶33.

While working in Mexico, Victim 2 met numerous other women who were forced to work in commercial sex by friends and relatives of Efrain Granados-Corona. Among the traffickers were Raul Romero-Granados, Isaac Lomeli-Rivera, and Julio Sainz-Flores. Victim 2 worked in and around bars in Tlaxcala and Puebla, Mexico for over a year. PSR ¶34.

Efrain Granados-Corona then took her and another victim (identified in the indictment as "Victim 3") to Tijuana to work. Victim 3, who primarily worked for Raul Romero-Granados, was approximately 14 or 15 years old at the time. *Id.*

Victim 2 worked in Tijuana with other victims for approximately three years. During that time, Efrain Granados-Corona and Raul Romero-Granados frequently struck the women. Efrain Granados-Corona collected all of the money made from the commercial sex.

While in Tijuana, Victim 2 attempted to escape by going to a hotel and fleeing in a taxi. Efrain Granados-Corona stopped the taxi and took her back to the house where they were staying. There, he beat her and pointed a gun at her head, threatening to kill her if she tried to escape. Pedro Rojas-Romero was present during the incident. PSR ¶35.

Approximately a year later, Efrain Granados-Corona arranged for Victim 2 to be smuggled into the United States with two other victims and Pedro Rojas-Romero. Efrain Granados-Corona paid the smuggling fee. On three occasions, they attempted to enter and were encountered by Border Patrol and returned to Mexico. PSR ¶36.

On their fourth attempt, joined by Efrain Granados-Corona, they successfully entered the United States and traveled to Phoenix before driving to New York. There, Victim 2 was brought to an apartment in Queens where other victims were residing. Efrain Granados-Corona gave her instructions and telephone numbers to call to obtain work. *Id.*

From approximately 2006 to 2009, the PSR said, Victim 2 worked for delivery services in Manhattan, Poughkeepsie, the Bronx, New Jersey, and Maryland, as well as at a brothel in Queens. When she returned home from work, Efrain Granados-Corona would ask her for the money she had earned and would physically search her and count the number of unused condoms. Victim 2 was forced to work seven days a week and had only two days off a month. PSR ¶37.

Victim 2 was arrested at the brothel and Efrain Granados-Corona beat her

badly when he learned she had provided their true home address to the police. The he moved her to another apartment in Queens, where she lived with Raul Romero-Granados and victims who worked for him. PSR ¶37.

While she was living with Raul Romero-Granados, Victim 2 attempted to escape but was seen spotted Raul. When she was returned to her room, Efrain Granados-Corona came home and beat her with a belt, kicked her repeatedly, and forcibly raped her vaginally and anally  PSR ¶38.

Victim 2 was forced to give all of the money she earned from the commercial sex to Efrain Granados-Corona. On some occasions, he directed Victim 2 to provide the money to Pedro Romero-Rojas or Raul Romero-Granados. When Efrain Granados-Corona was in Mexico, he instructed Victim 2 to send him and his family the money in Mexico. When Victim 2 stopped sending money, Efrain Granados-Corona telephoned her and threatened to harm her family.  PSR ¶39.

*Victim 10*:  Efrain Granados-Corona trafficked Victim 10 from 2007 to 2011, according to the PSR.  It started when Victim 10 was 16 years old.  PSR ¶40.

Efrain Granados-Corona met Victim 10 in Puebla, where she lived with her mother and brother. She had been abused by her mother and brother and was eager to get away from them. Efrain Granados-Corona told her that he had legal papers that permitted him to work in the United States selling Mexican products and that he could take her there to get her away from her brother.  *Id.*

10

Efrain Granados-Corona took Victim 10 to an apartment in Puebla where two other women were living and introduced her to his family members, including Raul Romero-Granados and Alan Romero-Granados, as well as his sister Juana, Raul Romero-Granados' mother. According to the PSR, after several weeks, Efrain Granados-Corona came home and lied to Victim 10, telling her that he owed money and had been threatened at gunpoint. He told Victim 10 that she could get the funds to repay the money by selling herself. When Victim 10 said no, Efrain Granados-Corona locked her in a room for two days without food. Afterwards, he forcibly took Victim 10 to Mexico City to work as a prostitute. When Victim 10 resisted, Efrain Granados-Corona hit her and threatened her and her family. PSR ¶41.

In 2008, Efrain Granados-Corona made arrangements to smuggle Victim 10 into the United States. On the first and second attempts, Victim 10 was encountered and arrested by Border Patrol while in possession of fraudulent identification documents that falsely listed her age as over 18. Immigration records confirmed that Victim 10 was arrested on June 12, 2008 and on July 3, 2008. On the third attempt, Victim 10 successfully entered the United States and was transported from Texas, to Tennessee, and then to New York, where she was met by Emilio Romero-Rojas. PSR ¶42.

After another victim, identified in the Indictment as Victim 2, provided delivery service information and instructions on how the commercial sex business worked, Victim 10 began working with the deliveries, and over the next two years,

11

worked in Manhattan, the Bronx, Westchester, Long Island, Queens, Maryland, New Jersey, Pennsylvania, Delaware, Washington D.C., and Boston, among other locations. Initially, per Granados-Corona's instructions, Victim 10 provided all the proceeds of the commercial sex to Victim 2 for Granados-Corona.  PSR ¶43.

Several months after Victim 10 arrived in the United States, Granados-Corona arrived. Victim 10 was moved to several different apartments, where she lived with multiple other victims working for Granados-Corona and his co-defendants.  PSR ¶44.

In December 2009, Victim 10 was arrested at a brothel in Maryland on misdemeanor prostitution charges and provided a false identity per Granados-Corona's instructions. After her release, she returned to New York. where Efrain Granados-Corona beat and kicked her, accusing her of being with another man. On other occasions, Granados-Corona beat her and forcibly raped her. When she returned from commercial sex work, Granados-Corona sometimes physically searched her vagina and anus looking for concealed money.

*Victim 1*:  Victim 1, according to the PSR,  was trafficked by Raul Romero-Granados and Efrain Granados-Corona from 2005 to 2007. The PSR said that Raul Romero-Granados met Victim 1 in Mexico and began trafficking her in 2005 when she was approximately 14 years old; Raul Romero-Granados drugged and raped Victim 1 when she was 14 or 15 years old. When she questioned what happened, Raul Romero-Granados told Victim 1 that she was never going home and if she refused to work as a prostitute her family would be harmed. She again

questioned why she was not permitted to leave, and she was subsequently beaten by Raul Romero-Granados and taken to Mexico City, where she was forced to engage in commercial sex acts. PSR ¶46.

In 2006, when she was approximately 15 years old, Victim 1 was smuggled into the United States and went to New York with Raul Romero-Granados. They went to the apartment where Efrain Granados-Corona lived with another victim. There Victim 1 met Victim 10 who was working for Granados-Corona at the time. There were approximately 8 to 10 victims at the apartment who were forced to work in commercial sex. While in the United States, Victim 1 worked as a prostitute in New York, Maryland, and Pennsylvania. *Id.*

On one occasion when Victim 1 was sent to work at a brothel in Baltimore, she asked a male working there for help. The man telephoned Efrain Granados-Corona. When Victim 1 returned to New York, Granados-Corona threatened her: if she ever spoke to anyone else, something would happen to her and her family. On another occasion while working in Maryland, Victim 1 escaped and returned to Mexico. While in Mexico, she stayed with relatives and learned from family members that Raul Romero Granados and two of his uncles came to her home looking for her.

**The plea proceeding:** As noted, Efrain Granados-Corona pleaded guilty to count three of the superseding indictment, which charged that he had violated 18 U.S.C. §1591(a), (b)(1), (b)(2), and 18 U.S.C. §2 with respect to Victim 10.

The statute is complex, containing a number of disjunctive clauses: there are

13

hundreds of different ways of violating it.[4]   The indictment is complex. too,

_____

[4]18 U.S.C. §1591 provides:

(a)Whoever knowingly—

(1)in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2)benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

(b)The punishment for an offense under subsection (a) is—

(1)if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

(2)if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

(c)In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

alleging in the conjunctive, as is common in such situations, that Efrain Granados-

Corona  violated the statute in a variety of different ways.  Had he gone to trial, a

_____

(d)Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

(e)In this section:

(1)The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

(2)The term "coercion" means—

(A)threats of serious harm to or physical restraint against any person;

(B)any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(C)the abuse or threatened abuse of law or the legal process.

(3)The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

(4)The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

(5)The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

(6)The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

15

jury would have been required to find him guilty if:

> he had enticed, harbored, transported, provided, obtained, or maintained someone,
>
> or
>
> he had benefitted financially from participating in a venture that did so,
>
> and
>
> he had done so knowing or in reckless disregard that force, threats, fraud or coercion would be used to cause the person to engage in a commercial sex act,
>
> or
>
> the person had not attained the age of eighteen.

During the course of the plea proceeding, the complexity of the statute and the indictment caused some concern, *see* A-111-114 (discussion between court and prosecutor concerning under which clause the plea was proceeding) and when the court described the elements of the offense, it included both force/threats/fraud/coercion and the age of the victim.

During the course of the plea colloquy, Efrain Granados-Corona did not admit that force, threats of force or coercion had been a factor in causing the girls and women to engage in commercial sex acts.

> THE COURT: Was force, fraud, or coercion used to cause these girls or women to engage in the commercial sex acts, to have sex for money?
>
> THE DEFENDANT: Not by means of force, no.
>
> THE COURT: Okay. By means of fraud, coercion?

16

THE DEFENDANT: No.

A-129.  The district court took a short recess and when the proceeding resumed,

Efrain Granados-Corona admitted that fraud had been used.

> THE COURT: Either when the women were transported
> from here -- from Mexico to New York, or while they were in
> Long Island, was force, fraud, or coercion used to cause these
> women to engage in these commercial sex acts?
>
> THE DEFENDANT: Fraud.
>
> THE COURT: Okay. Tell me about that.
>
> THE DEFENDANT: On occasions, it was done through
> deceit, and other occasions, no. There were some occasions
> when some of them would work voluntarily, and then this
> happened during the years while I was in Mexico. I left on
> January 8, 2010.
>
> THE COURT: Okay. What kind of deceit was used?
>
> THE DEFENDANT: Well, lies. They didn't know that
> there were going to be sexual acts.
>
> THE COURT: Okay.  So these women were told that they would be
> doing something else other than sexual acts in exchange for money?
>
> THE DEFENDANT: Uh-huh, yes.
>
> THE COURT: Did you know that these women were being
> told these lies?
>
> THE DEFENDANT: Yes.

A-131.[5]

---

[5]In the plea agreement, Efrain Granados-Corona "agree[d] not to dispute that
he trafficked, using force, fraud, and coercion, the victims identified in the
Indictment as "Victim-10," "Victim-1," and "Victim-2"; and that the sex
trafficking of all three victims constitutes relevant conduct for purposes of the
offense charged in Count Three." A-039.

17

Efrain Granados-Corona was not required during the plea proceeding to admit that Victim 10 had not attained the age of eighteen during the relevant time period.  *See* A-114 (prosecutor states that Efrain Granados-Corona agreed in plea agreement not to dispute that age of Victim 10, "but for the purposes of his allocution, he needs only to allocute to force fraud and coercion.")

***Calculation of the Sentencing Guidelines***: The plea agreement, the PSR, and the district court, all calculated the applicable offense level and criminal history category as follows:

**Multiple victims:** U.S.S.G. §§2G1.1(d)(1), U.S.S.G. 2G1.3(d)(1)
> Because the offense involved more than one victim, Chapter 3, Part D of the Guidelines was applied as if the prohibited conduct with respect to each victim had been contained in a separate count of conviction

**Victim 10**
> Base offense level: U.S.S.G. §2G1.3(a)(1) . . . . . . . . . . . . . . . . . . . . 34

> **Specific offense characteristics:**

> **Victim related adjustments:**
> U.S.S.G. §2G1.3(b)(2)(B)
> defendant unduly influenced minor victim to engage in prohibited sexual conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . +2

> U.S.S.G. §2G1.3(b)(2)(B)
> offense involved commission of sex act . . . . . . . . . . . . . . . . +2

**Victim 10 offense level** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Victim 1**
> Base offense level: U.S.S.G. §2G1.3(a)(1) . . . . . . . . . . . . . . . . . . . . 34

> **Specific offense characteristics:**

> **Victim related adjustments:**
> U.S.S.G. §2G1.3(b)(2)(B)

18

defendant unduly influenced minor victim to engage in
prohibited sexual conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . +2

U.S.S.G. §2G1.3(b)(2)(B)
offense involved commission of sex act . . . . . . . . . . . . . . . . +2

**Victim 10 offense level** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Victim 2**

Base offense level: U.S.S.G. §2G1.1(a)(1) . . . . . . . . . . . . . . . . . . . . 34

**Victim 2 offense level** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Grouping analysis**

U.S.S.G. §3D1.4(a) (*see* PSR at 18, ¶87) . . . . . . . . . . . . . . . . . . . . . . . 41

**Acceptance of Responsibility:** U.S.S.G. §3E 1.1 (a) . . . . . . . . . . . . . . . -2

**Acceptance of Responsibility:** U.S.S.G. §3E 1.1 (b) . . . . . . . . . . . . . . -1

**Total offense Level** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Efrain Granados-Corona fell within Criminal History Category I.

At 38/I, the recommended guideline range was 235-293 months' incarceration, and

he was subject to a mandatory minimum of 180 months' incarceration.  PSR ¶122.

*The sentencing proceeding:* Neither the government nor the defense

objected to the presentence report and the district court accepted its factual

findings.  A-137.

The defense argued that the fifteen-year mandatory sentence was sufficient

and not greater than necessary to accomplish the objectives of the federal

sentencing statute, A-138.  Since his extradition from Mexico, Efrain Granados-

Corona  had been held at the MCC and Westchester County Jail in conditions made

19

particularly harsh by the COVID epidemic.  A-139.  He had grown up in Tlaxcala, an area of extreme poverty where sex trafficking is rampant.  He himself had grown up impoverished.  A number of his family members were active in sex trafficking and they brought the young Efrain Granados-Corona into the family business.  A-140.

The longest sentence imposed on any co-defendant had been 137 months. Efrain Granados-Corona's conduct was, the defense recognized, more serious, but a sentence to the mandatory minimum 180 months would be sufficient to account for the more serious conduct involved in the Efrain Granados-Corona prosecution. A-140.  Such a sentence, the defense argued, was also sufficient to achieve the goals of specific and general deterrence.  A-140.

The court expressed concern that the presentence report had indicated that Efrain Granados-Corona had trained others in ways to conduct the sex trafficking operation.  A-141.

Victim 10 spoke at the sentencing.  She told the court of her tragic childhood and abusive family in Mexico.  Her father regularly beat her, her mother and her brothers.  He had a second-grade education and began work at 8.  A-144.

She said the Efrain Granados-Corona had befriended her and told her that he deserved something better in life and that he could get her a job with his family's company that sold Mexican products in the United States.  A-144-145.  After a violent argument at home, she agreed to go with him to the United States.  A-145.

She told the harrowing story of what happened after, similar to that set forth

20

at p. 10, *supra*,  of being raped, beaten, and deprived of food.  She was, she said, forced to work as a prostitute in Mexico City for 17 to 18 hours a day.  A-145. She said that after five months, Efrain Granados-Corona had arranged for coyotes to smuggle her into the United States and she told the court of her difficult trip from Arizona to Tennessee to Queens.  A-146.  She described in  detail her life working as a prostitute in New York and up and down the East Coast.  A-146-147. She asked that the Court sentence Efrain Granados-Corona  to the maximum punishment allowed.  A-148.

The government argued that Efrain Granados-Corona was the leader of the unlawful organization.  He was the only defendant from whom the government had demanded a plea to a count that carried a 15-year mandatory minimum sentence. His subjugation of other women followed the same script described by Victim 10. They became involved with him in a personal relationship and were  quickly forced into sexual slavery.  They were raped, violently beaten, held at gunpoint.  A-150. Efrain Granados-Corona  organized driving delivery services; had connections to brothels up and down the East Coast.  A-149.   The conduct, according to the government, extended over almost 29 years.  A-149-151.

The government, alluding to the defense observation that sex trafficking is pervasive in Tenancingo, Efrain Granados-Corona's home, a family business, almost, argued that the defense's observation was a persuasive argument for the need for deterrence.  A-151.  A sentence within the guidelines, the government argued, was appropriate.  A-152.

21

The district court suggested that even though the circumstances of the offense might suggest that a sentence at the top of the guidelines was warranted, the conditions of custody under which Efrain Granados-Corona had been held in Mexico and in the United States should be considered. A=152.

The government agreed that the conditions of confinement were an appropriate consideration. It had no information on the conditions of custody in Mexico. It argued, however, that other sentencing factors outweighed the conditions-of-confinement factor. A-153..

Efrain Granados-Corona allocuted. He had found a new way of thinking and of acting during his six years in confinement awaiting extradition and in the United States. He had tried to develop a close spiritual relationship with God and had participated in groups that studied the Bible and that prepared the participants to re-integrate into society. He asked the forgiveness of the women he had offended against, as well as from the prosecution and from his own family. A-154-56.

He said that when he was arrested in Mexico, he had been tortured for five hours. As a result, he had been required to take various medications in order to allow him to lead a normal life. He had contracted COVID. A-155-156. He had lost a brother to the disease. A-156.. He told the court that he had a family that needs him. He begged for forgiveness and promised that he never again would commit a bad act or damage anyone. A-156.

The district court was concerned about any disparity between this sentencing and the sentencing of other defendants in the case and counsel addressed those

concerns.  A-158-160.

After taking a recess, the court, without objection, imposed the requested order of restitution in the amount of $2,004,450 and the $100 special assessment. A-161.  It also executed the order of judicial removal from the United States, to which Efrain Granados-Corona consented. A-162.

The  court then went to the heart of the matter:

> Regarding custody, the conduct in this case is egregious. The victims have endured severe trauma as a result of Mr. Granados Corona's actions and there is a strong need for punishment and a need to promote respect for the law and a need for general and specific deterrence, and also a need to protect the public. Given those concerns, starting off at the top or even above the guideline range would be appropriate given the conduct in this case. However, Mr. Granados Corona has suffered under extremely harsh circumstances and conditions of confinement. This is not to compare the suffering that he has endured while confined to the extreme suffering that the victims have endured but that's not -- what's important here is conditions of confinement when he is in the criminal justice system are supposed to be better than what he has endured. What he has endured in Mexico and what he has endured here under the COVID-19 pandemic, those conditions justify a downward variance. In addition, the fact that he is going to be deported and has consented to a judicial order of removal also justify the sentence that I am going to impose. I am considering the fact that he entered the judicial order of removal as part of the basis for this sentence but the variance in this case is confined to the conditions of confinement
> .
>
> I am required to avoid unwarranted sentencing disparities. As the government has pointed out, there is a disparity between his sentence and the sentence of his co-defendants but that disparity is not unwarranted for all the reasons laid out by the government. I am required to impose a sentence that is sufficient but not greater than necessary to meet the goals of sentencing and this variance, regarding the conditions of confinement, is in no way to be construed in any way minimizing the trauma that the victims have suffered and I thank the victim for her written statement and for her statement here today. I know that that wasn't easy for her. I am going to impose a sentence slightly below the guideline range, ever so slightly below the guideline

23

range, and I will impose a sentence of 228 months of custody. That
will be followed by five years of supervised release. Regarding the
conditions of supervised release -- and he is going to be deported --
but in an abundance of caution I will impose supervised release and
these conditions, I will impose the mandatory conditions as set forth in
the presentence report, as well as the standard conditions as set forth
in the presentence report.

A-162-164.

There was a small twist at the conclusion of the sentencing. The defense

requested that Efrain Granados-Corona be given credit for the time that he spent in

Mexican prison awaiting deportation to the United States. a period of 18 months,

from October 26, 2016 to April 26, 2018. A-168, 170. The Bureau of Prisons

would credit Efrain Granados-Corona with time spent after he was taken into

federal custody but would not credit time spent in foreign detention, even though

that detention was based upon the federal arrest warrant. A-168, 171. The

defense suggested that the court include in its judgment that the 228-month

sentence commenced on the day of the Mexican arrest. The court asked whether

Efrain Granados-Corona had been held in Mexico solely on the basis of the

American warrant. He was, although the government pointed out that he had

committed a variety of crimes in Mexico as well. A-171.

> OK. Then here is what I will do. I will modify the
> sentence to give him a lot of credit for the time
> confinement that he has faced in Mexico and in the
> United States, as well as the time that he spent in Mexico
> awaiting extradition. So, the sentence is 212 months of
> custody. that he spent in Mexico due to the, again the
> nature of the charges and the seriousness of the offense
> and the other things that I have stated. I am not going to
> give him credit for all 18 months in terms of the sentence,
> but I will credit him for 16 months of that 18 months and

24

I will reduce his sentence to 212 months. So, the variance
is based on the conditions of confinement that he has
faced in Mexico and in the United States, as well as the
time that he spent in Mexico awaiting extradition. So, the
sentence is 212 months of custody.

A-171-72.

As noted, *see* p. 1, *supra*, a timely appeal followed.

## SUMMARY OF ARGUMENT

The Court should decline to enforce the appeal waiver of the plea

agreement.  It should remand to the district court with instructions to lower by two

months the sentence imposed in order to credit Efrain Granados-Corona fully for

the time he spent in inhuman custody in Mexico on the basis of the federal arrest

warrant.  It should not rule on our claims concerning ineffective assistance of

counsel, allowing Efrain Granados-Corona to make those claims in a habeas

proceeding.

## ARGUMENT

**1.  The Court should not enforce the appeal waiver of the plea
agreement.**

***Factual and procedural background:***

**The plea agreement:** The plea agreement contained an appeal waiver.

It is agreed (I) that the defendant will not file a direct
appeal; nor bring a collateral challenge, including but not
limited to an application under Title 28, United States
Code, Section 2255 and/or Section 2241, of any sentence
within or below the Stipulated Guidelines Range of 235
to 293 months' imprisonment, and (ii) that the
Government will not appeal any sentence within or above
the Stipulated Guidelines Range. This provision is

25

> binding on the parties even if the Court employs a
> Guidelines analysis different from that stipulated to
> herein. Furthermore, it is agreed that any appeal as to the
> defendant's sentence that is not foreclosed by this
> provision will be limited to that portion of the sentencing
> calculation that is inconsistent with ( or not addressed by)
> the above stipulation. The parties agree that this waiver
> applies regardless of whether the term of imprisonment is
> imposed to run consecutively to or concurrently with the
> undischarged portion of any other sentence of
> imprisonment that has been imposed on the defendant at
> the time of sentencing in this case. The defendant further
> agrees not to appeal any term of supervised release that is
> less than or equal to the statutory maximum. The
> defendant also agrees not to appeal any fine that is less
> than or equal to $500,000, and the Government agrees
> not to appeal any fine that is greater than or equal to
> $50,000. The defendant also agrees not to appeal any
> special assessment that is less than or equal to $5,100.
> Notwithstanding the foregoing, nothing in this paragraph
> shall be construed to be a waiver of whatever rights the
> defendant may have to assert claims of ineffective
> assistance of counsel, whether on direct appeal, collateral
> review, or otherwise. Rather, it is expressly agreed that
> the defendant reserves those rights.

A-043-044. The sentence of 212 months was lower than the plea agreement's

upper limit of 293 months.

   ***The guilty plea proceeding:***  During the course of the Rule 11

colloquy, the following exchange took place.

   THE COURT: You have a statutory right to appeal. Do you
understand?

   THE DEFENDANT: Yes.

   THE COURT: Although you have a statutory right to appeal,
under your agreement, you've agreed not to file a direct appeal or
bring a collateral challenge of any sentence within or below the
guideline range of 235 to 293 months in
prison.

26

Do you understand?

THE DEFENDANT: Yes.

A-124.

As noted, the district court imposed a sentence of 212 months, below the 293 months set forth as the appeal threshold in the plea agreement.

**Standard of review:** The appeal-waiver provision, admittedly, was not raised in the district court, but it is not the kind of question that would arise in that proceeding. If this Court decides that the appellate waiver should have specifically been raised in the district court, this Court reviews unpreserved issues for plain error. *United States v. Cook*, 722 F.3d 477, 480-81 (2d Cir. 2013). The plain-error standard is described in *United States v. Burden*, 860 F.3d 45, 52 (2d Cir. 2017):

> Plain error review requires a defendant to demonstrate that (1) there was error, (2) the error was plain, (3) the error prejudicially affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings. . . . .Generally, the "substantial rights" prong requires a defendant to demonstrate that the claimed error affected the outcome of the district court proceedings. . . .

**Discussion:** This Court has provided instructions to appellate counsel who is appointed in cases in which a defendant has entered into an appeal waiver as a part of his plea agreement in the district court. *United States v. Gomez-Perez*, 215 F.3d 315, 319 (2d Cir. 2000). The guidance of *Gomez-Perez* anticipates that counsel will ultimately file a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), and this is not an *Anders* brief, but *Gomez-Perez* does instruct counsel that

27

certain factors should be considered in this situation, so each is duly considered in the course of this argument.

As a general matter, "[w]aivers of the right to appeal a sentence are presumptively enforceable." *United States v. Burden*, 860 F.3d 45, 51 (2d Cir. 2017); *United States  v. Arevalo*, 628 F.3d 93, 98 (2d Cir. 2010); *accord*, *Gomez-Perez*, 215 F.3d at 319; *United States v. Salcido-Contreras*, 990 F.2d 51 (2d Cir. 1993).

It is not the case, however, "that these contractual waivers are enforceable on a basis that is unlimited and unexamined." *United States v. Ready*, 82 F.3d 551, 555 (2d Cir. 1996), *superseded on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013).

There are a variety of situations in which this Court  has indicated that it would decline to enforce appellate waivers.  Each is considered below.

***Contractual invalidity:*** This Court has frequently stated that "[w]e construe plea agreements according to contract law principles . . . ." *United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011); *United States v. Yemitan*, 70 F.3d 746, 747 (2d Cir.1995).   "[A] guilty plea can be challenged for contractual invalidity. . . ." *United States v. Brunetti*, 376 F.3d 93, 95 (2d Cir. 2004); *accord*, *United States v. Lutchman*, 910 F.3d 33 (2d Cir. 2018).  This Court has also stated that "because plea agreements are unique contracts, we temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards." *United States v. Woltmann*, 610 F.3d 37, 39–40 (2d

Cir.2010).

We have examined the plea agreement into which Efrain Granados-Corona entered, A-043, and can find no provision that can be attacked as contractually invalid or ambiguous.

***Various constitutional defects:*** This Court has indicated that it would decline to enforce appellate waivers in cases in which errors of a constitutional magnitude or violations of fundamental rights have occurred during sentencing. *See, e.g., United States v. Woltmann*, 610 F.3d 37, 39-40 (2d Cir. 2010) (sentencing court essentially abdicated judicial responsibility for sentencing); *United States v. Liriano-Blanco*, 510 F.3d 168, 172 (2d Cir. 2007) (where district court repeatedly but mistakenly referred to the possibility of appeal to determine a question of first impression and was not corrected by counsel, appeal waiver would not be enforced); *United States v. Adams*, 448 F.3d 492, 497 (2d Cir. 2006) (errors in guilty plea proceedings); *United States v. Johnson*, 347 F.3d 412, 415, 419 (2d Cir. 2003) (sentence arguably based on defendant's indigence); *Gomez-Perez*, 215 F.3d at 319 (recognizing that appellate waiver is unenforceable if sentence were based on race); *United States v. Martinez-Rios*, 143 F.3d 662, 668-69 (2d Cir.1998) (waiver of appeal of *any* sentence within *any* guideline range that might be determined by the sentencing court is unenforceable); *accord, United States v. Goodman*, 165 F.3d 169, 174 (2d Cir. 1999); *United States v. Rosa*, 123 F.3d 94, 98 (2d Cir.) (1997) (recognizing that appellate waiver may be unenforceable if government breached the plea agreement); *United States v.*

29

*Yemitan*, 70 F.3d 746, 748 (2d Cir.1995) (district court failed to enunciate sentencing rationale, abdicating judicial responsibility); *Ready*, 82 F.3d at 556-57 (2d Cir.1996) (waiver not knowing and voluntary); *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir.1994) (sentence arguably based on naturalization status).

The undersigned can identify no such errors.

***Appellate waivers strictly construed:*** Appellate waivers are applied "narrowly," and this Court construes them "strictly against the Government." *United States v. Oladimeji*, 463 F.3d 152, 157 (2d Cir. 2006). "[B]ecause plea agreements are unique contracts, we temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards." *Riggi*, 649 F.3d at 147 (internal quotation marks omitted). Accordingly, "courts construe plea agreements strictly against the Government," which "is usually the party that drafts the agreement" and "ordinarily has certain awesome advantages in bargaining power." *Ready*, 82 F.3d at 559.

As we have noted, we have examined the plea agreement, and in particular the appeal waiver provisions of the agreement, in order to identify some ambiguity or glitch in drafting that might inure to Efrain Granados-Corona's benefit and can find no such ambiguity.

***Defects in Rule 11 canvass:*** The Court has declined to enforce appellate waivers where an insufficient factual basis for the plea or errors in the plea proceeding undermined the waiver's knowing, voluntary, and competent character. *See, e.g.*, *Liriano-Blanco*, 510 F.3d at 172; *Adams*, 448 F.3d at 497. The Court

will not enforce a waiver of appellate rights when the "waiver was not made knowingly, voluntarily, and competently." *Gomez-Perez*, 215 F.3d at 319 . Such circumstances may exist where there were significant errors in the process leading to the plea, including failure "to comply with the important strictures of Rule 11, which governs entry of guilty pleas." *United States v. Lloyd*, 901 F.3d 111, 118 (2d Cir. 2018).

The undersigned has reviewed the guilty-plea canvass and has not identified any errors that would allow for the withdrawal of the plea. Rule 11(b)(1)(M) does require the district court to inform a defendant of the court's obligation to calculate and consider the recommended guideline sentencing range, and the district court did so here, A-080. Misapprehensions at the time of plea concerning what that range might be do not violate Rule 11 I any case, but in this case, the plea agreement, the PSR, and the sentencing court concurred on the calculation of the guidelines and the recommended guideline range.

*Gomez-Perez*, 215 F.3d at 319 instructs that appellate counsel should consider whether it would be against an appellant's interest to contest his guilty plea. As noted, the undersigned has reviewed the plea proceeding against a Rule 11 checklist and has found no deficiency, but even if there were, the loss of certain benefits provided by the plea agreement could have serious adverse consequences, the most obvious being the reinstatement of the indictment and an increase in the sentence that he would face if convicted on all counts after a trial or a plea.

***Overriding public interest:*** While a defendant who pleads guilty "can waive

31

elemental constitutional and statutory rights," *United States v. Braimah*, 3 F.3d 609, 611 (2d Cir.1993), a defendant "may be deemed incapable of waiving a right that has an overriding impact on public interests." *Ready*, 82 F.3d 551 at 555. Such a waiver may "irreparably discredit[] the federal courts," *id*. at 556; *accord United States v. Mezzanatto*, 513 U.S. 196, 204 (1995).

*Riggi*, 649 F.3d at 148, suggests that if "the right at issue" has "an overriding impact on public interests" and the "sentence was reached in a manner that the plea agreement" did not anticipate, an appellate waiver might be disregarded. We have in past briefs stated the principle more colorfully: A defendant sentenced by an orangutan who picked a number out of a hat would probably be permitted to appeal his sentence, no matter how meticulously crafted the plea agreement's appellate waiver or how careful the Rule 11 canvass might have been.[6]

We, as might be expected, view the issue presented in Argument 2 of our brief as a question of such importance that disregard of the waiver is justified.

**Ineffective assistance of counsel:** Finally, an appellate waiver may be disregarded in cases where the defendant has suffered from ineffective assistance of counsel. While Efrain Granados-Corona complains about the performance of his counsel, *see* Argument 2, *infra*, he did not voice such complaints during the course of the proceedings below and the evidence necessary to corroborate his complaints is not the kind of material that can be expected to be found in the

---

[6]Or, we might add, how accurate might be a defendant's prediction that the orangutan-sentencing method was likely to result in a sentence more merciful than a sentence within the recommended sentencing-guideline range.

district court record.  The complaints set forth in Efrain Granados-Corona's notice of appeal largely concern counsel's performance at sentencing rather than the decision as to whether to enter a guilty plea.

"The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed de novo." *Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000). The standard for establishing a claim of ineffective assistance of counsel is well established. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (defendant must show that counsel's representation fell below an objective standard of reasonableness, and that the deficient performance prejudiced defendant).

As is usual, the record on appeal does not include much evidence concerning Efrain Granados-Corona's interactions with defense counsel – the kind of evidence that would be submitted in a habeas proceeding.  This Court has repeatedly expressed a "baseline aversion to resolving ineffectiveness claims on direct review." *United States v. Levy*, 377 F.3d 259, 265 (2d Cir. 2004); *accord*, *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003).   As we repeat in Argument 2, such claims are better suited for review in the first instance through a habeas petition to the district court, which is "the forum best suited to developing the facts necessary to determining the adequacy of representation." *Massaro v. United States*, 538 U.S. 500, 505  (2003).  Without further evidence, consideration of ineffectiveness of counsel is "unripe for seasoned retrospection." *United States v.*

33

*Salameh*, 152 F.3d 88, 160 (2d Cir. 1998). Mr. Efrain Granados-Corona is not foreclosed by law or by the plea agreement from asserting an ineffective assistance of counsel claim in a future motion under 28 U.S.C. § 2255.

***Governmental declination to seek enforcement of an appeal waiver:*** An appeal waiver may be ignored where the government declines to request its enforcement, as may occur where the government believes that a substantive issue raised by the appeal needs deciding or where the government agrees that fundamental fairness requires that the appeal be heard. As this brief is filed, the government has not moved to dismiss this appeal based on the appeal waiver, but that is not to predict that it will not do so.

**2. The sentencing court erred in varying downwardly by only sixteen, rather than eighteen, months in order to account for the time Efrain Granados-Corona spent in the custody of Mexican authorities awaiting extradition to the United States.[7]**

***Factual and procedural background:*** In his notice of appeal, Efrain

-----

[7]The defendant has instructed the undersigned to advance this and the following argument. The undersigned does so both in order to comply with the defendant's wishes and to advance the objective of judicial economy: it is far more effective to decide these issues now than to be required to consider them years from now in a proceeding brought under 28 U.S.C. § 2255, alleging incompetence of appellate counsel. After all, seemingly immutable legal principles do, from time to time, unexpectedly change. *See, e.g.*, *United States v. Booker*, 543 U.S. 220 (2005) (rendering advisory sentencing guidelines that had long been thought mandatory) ; *Crawford v. Washington*, 541 U.S. 36 (2004) (radically reformulating decades of confrontation-clause analysis). In addition, the undersigned always complies with the form instructions issued by the Court that he notify the defendant-appellant of the availability of filing a pro se brief in order to make up for counsel's deficiencies, and it is probably easier for the Court to reach a principled decision on arguments the defendant wishes to advance if those arguments are made in our principal brief rather than in a supplemental prisoner brief.

Granados-Corona sets forth the following reason for his appeal:

> Primarily, the time of 18 months that I was in prison in Mexico, which was ordered by US authorities, was not counted.

A-105.

Efrain Granados-Corona had been arrested in Mexico on October 26, 2016, PSR ¶20. He came into federal custody was extradited to the United States on April 26, 2018. PSR p.1. The period that he was held in Mexican detention awaiting deportation to the United States was 18 months. After determining that Efrain Granados-Corona had been held by Mexican authorities solely on the basis of the American arrest warrant and not on the basis of any Mexican charges, the court decided to reduce the sentence it had intended to impose by sixteen months.

> OK. Then here is what I will do. I will modify the sentence to give him a lot of credit for the time that he spent in Mexico due to the, again the nature of the charges and the seriousness of the offense and the other things that I have stated. I am not going to give him credit for all 18 months in terms of the sentence, but I will credit him for 16 months of that 18 months and I will reduce his sentence to 212 months. So, the variance is based on the conditions of confinement that he has faced in Mexico and in the United States, as well as the time that he spent in Mexico awaiting extradition. So, the sentence is 212 months of custody. confinement that he has faced in Mexico and in the United States, as well as the time that he spent in Mexico awaiting extradition. So, the sentence is 212 months of custody.

A-171-72

***Standard of review:*** "We review sentencing decisions for procedural and substantive reasonableness." *United States v. Eaglin*, 913 F.3d 88, 94 (2d Cir. 2019). We apply a "deferential abuse-of-discretion standard" to both procedural and substantive review. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008)

(en banc). "A district court commits procedural error where it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the . . . Guidelines as mandatory, fails to consider the [18 U.S.C.] § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Robinson*, 702 F.3d 22, 38 (2d Cir. 2012) In analyzing the substantive reasonableness of a sentence, this Court "will identify as substantively unreasonable only those sentences that are so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing them to stand would damage the administration of justice." *United States v. Singh*, 877 F.3d 107, 115 (2d Cir. 2017).

    ***Discussion:*** Under 18 U.S.C. § 3585(a), a sentence commences "on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." Section 3585(b) provides that:

> A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
> (1) as a result of the offense for which the sentence was imposed; or
>
> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
>
> that has not been credited against another sentence.

18 U.S.C. § 3585(b). The Bureau of Prisons ("BOP") has the responsibility for

determining when a defendant's sentence commences and how much credit a defendant is to receive towards his sentence. *See United States v. Wilson*, 503 U.S. 329, 335 (1992); *United States v. Labeille-Soto*, 163 F.3d 93, 99 (2d Cir. 1998) (explaining that the "precise date" on which a sentence is to commence "is to be determined by the Bureau of Prisons").

The government and the defense seemed to agree in the district court that the Bureau of Prisons would not consider that Efrain Granados-Corona's time in a Mexican prison should be credited against the sentence imposed in this case. The district court agreed and modified its sentence by varying downwardly by sixteen months. Efrain Granados-Corona argues that the court did not go far enough. The conditions of confinement that he suffered in Mexico, the torture that he told the court that he suffered there, the permanent damage to his health that resulted form that torture, and the length of the sentence that the court imposed all suggest that the court should have credited Efrain Granados-Corona with at least the full eighteen months that he spent in Mexican custody based on the United States warrant.

### 3. Efrain Granados-Corona received ineffective assistance of counsel.

***Factual and procedural background:*** In his notice of appeal, Efrain Granados-Corona sets forth as grounds for the appeal a number of complaints concerning his representation in the district court. He was, he says, "never informed or prepared for the day of" his sentencing. He had not been prepared by his attorney for the possibility that Victim 10 would speak at his sentencing. He

37

does not speak English and "throughout my process, I never received documents of my process in Spanish." His attorney "never informed me of the content of acceptance of culpability, he only gave me the information he wanted to give." He had tried several times to contact his attorney and had never had a response to his calls. A-105.

Efrain Granados-Corona's retained attorney represented him during the entry of his guilty plea, and thereafter submitted a sentencing memorandum on his behalf. That attorney requested to withdraw because irreconcilable differences had arisen between them concerning the direction of the defense and Efrain Granados-Corona declined to communicate with him. ECF #287. Thereafter, a CJA attorney was appointed. He prepared a second sentencing memorandum and represented Efrain Granados-Corona at sentencing. His second attorney was able to obtain for Efrain Granados-Corona a sentence 23 months below the floor of the recommended guideline sentence.

**Discussion:** It may well be that Efrain Granados-Corona received ineffective assistance of counsel, as he claims, but it is impossible to make such a determination from the record of the district court. The kinds of information that is needed to determine the veracity and the strength of Efrain Granados-Corona's complaints is not available in the cold record of this case. It is seldom available in cases in which a criminal defendant complains of ineffective assistance of counsel. Did counsel not prepare for sentencing? Would the sentencing have been different if Efrain Granados-Corona had been informed that Victim 10 would speak? Other

38

than the plea agreement, *see* A 119-129, and the PSR, *see* A-137, it may well have been that Efrain Granados-Corona could not understand any of the crucial discovery or pleadings -- but there is no way to establish that through the record of the district court.

"When faced with a claim for ineffective assistance of counsel on direct appeal, we may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." *United States v. Tarbell*, 728 F.3d 122, 128 (2d Cir. 2013). "Among these options, the Supreme Court has instructed that in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Id*. at 128–29. "However, we may decide ineffective assistance claims on direct appeal when their resolution is beyond any doubt or to do so would be in the interest of justice." *United States v. Kimber*, 777 F.3d 553, 562 (2d Cir. 2015).

The undersigned can advance no persuasive reason why an ineffective-assistance-of-counsel claim should be decided on direct appeal. Efrain Granados-Corona has instructed that such a claim be made but we fear that based on the record before the Court, no such claim could succeed.  The undersigned thus suggests that the Court adhere to its usual practice and decline to address the ineffective assistance claim, leaving it to Efrain Granados-Corona  to raise it in a collateral proceeding.

39

## CONCLUSION

For the above-stated reasons, the defendant-appellant Efrain Granados-

Corona  respectfully requests:

> that the Court decline to enforce the appeal waiver set forth in
> the plea agreement;
>
> that the Court vacate the judgment; and
>
> that the Court remand for re-sentencing with instructions that the
> district court give Efrain Granados-Corona credit for the two
> additional months that he spent in Mexican custody by varying
> downward for an additional two months.

Respectfully submitted,

/s/

JEREMIAH DONOVAN
123 Elm Street--Unit 400
P.O. Box 554
Old Saybrook, CT 06475
(860) 388-3750
FAX 388-3181
Juris no. 305346
Fed.bar.no. CT 03536
jeremiah_donovan@sbcglobal.net

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B).  The brief contains 10,522 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)  because this

brief has been prepared in proportionally spaced typeface using Word Perfect x8 and Times-Roman 14 point font.

_____/s/_____
JEREMIAH DONOVAN

41