UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | **AFFIRMATION** |
| Appellee, | Docket No. 22-2323 |
| v. | |
| EFRAIN GRANADOS-CORONA, also known as Chavito, also known as Cepillo, | |
| Defendant-Appellant, | |
| RAUL ROMERO-GRANADOS, also known as Chicarcas, also known as El Negro, ISAAC LOMELI-RIVERA, also known as Giro, JUAN ROMERO-GRANADOS, also known as Chegoya, also known as El Guero, ALAN ROMERO-GRANADOS, also known as El Flaco, PEDRO ROJAS-ROMERO, EMILIO ROJAS-ROMERO, JULIO SAINZ-FLORES, also known as Rogelio, | |
| Defendants. | |

STATE OF NEW YORK          )
COUNTY OF NEW YORK      : ss.:
SOUTHERN DISTRICT OF NEW YORK   )

JACQUELINE KELLY, pursuant to 28 U.S.C. § 1746, hereby declares under

penalty of perjury:

1.    I am an Assistant United States Attorney in the Office of Damian

Williams, United States Attorney for the Southern District of New York. I

1

represented the Government in the proceedings in the District Court, and I represent the Government in this appeal. I submit this affirmation in support of the Government's motion to dismiss this appeal brought by defendant-appellant Efrain Granados-Corona based on Granados-Corona's knowing and voluntary waiver of his appellate rights in this case.

## PRELIMINARY STATEMENT

2.      Granados-Corona appeals from a judgment of conviction entered on September 20, 2022, in the United States District Court for the Southern District of New York, by the Honorable Andrew L. Carter Jr., United States District Judge, following Granados-Corona's guilty plea.

3.      Indictment S3 16 Cr. 324 (ALC) (the "Indictment") was filed on September 15, 2016, charging Granados-Corona in Count One with conspiracy to commit sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1594(c); in Counts Three and Four with sex trafficking two minor victims, identified in the Indictment as Victim-1 and Victim-10, by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a), (b)(1), and (b)(2); in Count Five with sex trafficking an adult victim, identified in the Indictment as Victim-2, by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a) and (b)(1); in Count Twelve with transporting Victim-10 for purposes of prostitution, in violation of 18 U.S.C.

§ 2423; and in Count Fifteen with transporting Victim-2 for purposes of prostitution, in violation of 18 U.S.C. § 2421.

4.      On November 1, 2019, Granados-Corona pleaded guilty to Count Three of the Indictment, charging him with sex trafficking of a minor victim (Victim-10) by force, fraud, and coercion. He entered the plea pursuant to a written plea agreement with the Government (the "Plea Agreement") in which he agreed that he would not dispute that he also trafficked Victim-1 and Victim-2 by force, fraud, and coercion. (A. 39).[1] The Plea Agreement contained a stipulation about the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). The parties agreed that the applicable Guidelines range was 235 to 293 months' imprisonment, with a mandatory minimum prison term of 15 years. (A. 40-42). In addition, Granados-Corona agreed, *inter alia*, not to appeal or collaterally challenge any sentence less than or equal to 293 months' imprisonment. (A. 43).

5.      On September 15, 2022, Judge Carter sentenced Granados-Corona to 212 months' imprisonment, to be followed by five years of supervised release, and

---

[1] "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Granados-Corona's sentencing; "Br." refers to Granados-Corona's brief on appeal; and "A." refers to the appendix submitted with that brief. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

imposed $2,004,450 in restitution and a $100 mandatory special assessment. (A. 97-104).

6.     Granados-Corona is serving his sentence.

## STATEMENT OF FACTS

**A.     The Offense Conduct**

7.     Granados-Corona was a senior member of an international sex trafficking organization ("STO") that used a variety of means, including physical and sexual violence, threats, false promises and pretenses, and coercion, to force minor-aged and adult female victims to work in commercial sex in Mexico and the United States. (PSR ¶¶ 21-22). The STO victimized dozens of women and girls, most of whom were born in Mexico. In most instances, Granados-Corona and his co-conspirators enticed the victims into romantic relationships in Mexico and induced them into commercial sex work using a combination of threats, lies, and physical force. Many of the girls and women were then smuggled into the United States to continue working in commercial sex. (PSR ¶¶ 23-24).

8.     Once in the United States, the victims were held by Granados-Corona and his co-conspirators at a number of shared apartments in New York City, but were forbidden to speak to one another. (PSR ¶ 25). Granados-Corona and his co-conspirators continued to use violence, threats, lies, and coercion to force the victims to continue working. (PSR ¶ 25). The victims worked in brothels and were brought

by "delivery services" to meet with commercial sex customers. (PSR ¶ 26). Typically, each customer paid $30 to $35 for 15 minutes of sex. (PSR ¶ 27). Generally, half of the proceeds went to the driver or to the brothel and half went to the trafficker, leaving victims with nothing. (PSR ¶ 27).

9.      Granados-Corona repeatedly used brutal violence against his victims. (PSR ¶¶ 32-35, 37-38, 41, 45). He trained some of his co-defendants, including some of his family members, how to traffic women, and he facilitated other defendants' involvement in trafficking, including by paying for their victims to be smuggled into the United States, providing housing for those victims in the United States, and using victims he controlled to help get commercial sex work for other victims. (PSR ¶ 30).

10.      The Plea Agreement accounts for Granados-Corona's involvement in trafficking three victims in the United States, identified in the Indictment as Victim-1, Victim-2, and Victim-10. (A. 39-40).

<u>Victim-1</u>

11.      Victim-1 was trafficked by Granados-Corona and his nephew Raul Romero-Granados from approximately 2005 to 2007. Romero-Granados met Victim-1 in Mexico and began trafficking her in 2005, when Victim-1 was approximately 14 years old. (PSR ¶ 46). Romero-Granados drugged and raped Victim-1 and, when Victim-1 questioned what had happened, threatened to harm her family if she refused to work as a prostitute. (PSR ¶ 46).

12.     In 2006, when she was approximately 15 years old, Victim-1 was smuggled into the United States and taken to a New York apartment where Granados-Corona was living with eight to 10 victims who were forced to work in commercial sex, including Victim-10. (PSR ¶ 46). Victim-1 then worked as a prostitute for the STO in New York, Maryland, and Pennsylvania. (PSR ¶ 46).

13.     On one occasion, Victim-1 asked an employee at a brothel in Baltimore for help, and the employee called Granados-Corona. (PSR ¶ 47). When Victim-1 returned to New York, Granados-Corona threatened to harm her and her family if she ever spoke to anyone else. (PSR ¶ 47).

### Victim-2

14.     Granados-Corona met Victim-2 at a dance club in Mexico, drugged and raped her on their third date, and trafficked her from approximately 2003 to 2009. (PSR ¶ 31). After the two dated for approximately one month, Granados-Corona directed Victim-2 to start working for him in commercial sex. (PSR ¶ 32). When Victim-2 initially refused, Granados-Corona beat her with a metal belt buckle, dragged her by her hair, and raped her. (PSR ¶ 32). When Victim-2 began working as a prostitute, Granados-Corona demanded all the money she made and asked whether she preferred working in prostitution or receiving a beating. (PSR ¶ 32).

15.     Granados-Corona forced Victim-2 to engage in commercial sex in both Mexico and the United States. (PSR ¶¶ 34-37). While working in Mexico, Victim-2

met numerous other women who were forced to work in commercial sex by friends and relatives of Granados-Corona. (PSR ¶ 34). On one occasion in Tijuana, Victim-2 tried unsuccessfully to escape Granados-Corona, who responded by beating her, pointing a gun at her head, and threatening to kill her if she tried to escape again. (PSR ¶ 35).

16.     Approximately one year after Granados-Corona first forced Victim-2 into prostitution, Victim-2 was smuggled into the U.S. with Granados-Corona and others and brought to an apartment in Queens where other victims resided. (PSR ¶ 36). Granados-Corona then instructed Victim-2 how to arrange commercial sex work. (PSR ¶ 36).

17.     From approximately 2006 to 2009, Victim-2 worked for "delivery services" in Manhattan, Poughkeepsie, the Bronx, and other locations outside New York. (PSR ¶ 37). She was forced to work all but two days every month, and Granados-Corona demanded all of the money she made. (PSR ¶¶ 37, 39). When Granados-Corona returned to Mexico, he instructed Victim-2 to send him and his family the commercial sex proceeds there; he threatened Victim-2 and her family when she stopped doing so. (PSR ¶ 39).

<u>Victim-10</u>

18.     Granados-Corona trafficked Victim-10 from 2007 to 2011, beginning when Victim-10 was 16 years old. (PSR ¶ 40). He met Victim-10 in Mexico and

falsely told her that he could take her to the United States because he had legal papers to work there selling Mexican products. (PSR ¶ 40). Granados-Corona then took Victim-10 to a nearby apartment and lied to Victim-10 that he needed her to make money for him as a prostitute because he had been threatened with a gun. (PSR ¶ 41). Victim-10 said no, so Granados-Corona locked her in a room for two days without food. (PSR ¶ 41). After Granados-Corona released her, he forced Victim-10 to go to Mexico City to engage in commercial sex work, beating and threatening her when she resisted. (PSR ¶ 41).

19.    In approximately 2008, Granados-Corona arranged to smuggle Victim-10 into the United States and transport her to New York, where she was forced to continue working as a prostitute. (PSR ¶ 42). Several months after Victim-10 came to New York, Granados-Corona arrived and moved her to various apartments where she lived with other victims working for Granados-Corona and his co-defendants. (PSR ¶ 44). Over the next two years, Victim-10 worked as a prostitute in Manhattan, the Bronx, Westchester, Long Island, Queens, Maryland, New Jersey, Pennsylvania, Delaware, Washington D.C., and Boston, among other locations. (PSR ¶ 43). Victim-10 provided all the proceeds from that work to Granados-Corona. (PSR ¶ 43).

20.    In December 2009, Victim-10 was arrested at a brothel in Maryland on misdemeanor charges and presented a false identity, as Granados-Corona had

instructed her to do. (PSR ¶ 45). After Victim-10 was released and returned to New York, Granados-Corona accused her of being with another man while she was away and beat and kicked her. (PSR ¶¶ 45, 59).

**B.** **The Plea Agreement and the Guilty Plea**

21.     On November 1, 2019, Granados-Corona pleaded guilty pursuant to the Plea Agreement, which contained a stipulated Guidelines calculation of 235 to 293 months' imprisonment, with a mandatory minimum prison term of 180 months. (A. 42). Under the Plea Agreement, the parties stipulated that Granados-Corona trafficked Victim-1, Victim-2, and Victim-10. (A. 41-42). Granados-Corona stipulated that under the Guidelines, the total offense level was 38 and his Criminal History Category was I. (A. 42).

22.     Under the Plea Agreement, Granados-Corona agreed that he would "not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence within or below the Stipulated Guidelines Range of 235 to 293 months' imprisonment." (A. 43). Granados-Corona further "agree[d] not to appeal any term of supervised release that is less than or equal to the statutory maximum" (*i.e.*, five years), "any fine that is less than or equal to $500,000," or "any special assessment that is less than or equal to $5,100." (A. 44).

23.    During the plea allocution before Judge Carter, Granados-Corona confirmed that he had read the Plea Agreement, discussed it with counsel, understood its terms, and signed it. (A. 119-20). Granados-Corona further confirmed that, under the Plea Agreement, he was waiving his right to appeal or challenge any sentence up to 293 months in prison. (A. 124).

## C.    The Sentencing

24.    Consistent with the parties' stipulation in the Plea Agreement, the Probation Office calculated an applicable Guidelines range of 235 to 293 months' imprisonment, with a mandatory minimum prison term of 180 months. (PSR ¶ 122). The Probation Office recommended a prison sentence of 293 months. (PSR at 26-29).

25.    In a sentencing letter on December 15, 2021, the Government requested a sentence within the stipulated Guidelines range of 235 to 293 months' imprisonment, arguing that a lengthy sentence in that range would be appropriate given the gravity of the offense, Granados-Corona's central role in the trafficking scheme, the need for deterrence, and the extreme trauma Granados-Corona's victims suffered. (A. 55-64).

26.    A defense sentencing letter filed on December 14, 2021, requested "the minimum incarceratory sentence." (A. 49). In support of that request, defense

counsel highlighted Granados-Corona's remorse and lack of a criminal history. (A. 48-49).

27.     Between the filing of the defense's initial sentencing letter and the sentencing, new counsel was appointed to represent Granados-Corona. Newly appointed counsel then submitted two supplemental sentencing letters on Granados-Corona's behalf. (A. 65-89).

28.     The first supplemental sentencing letter, dated August 31, 2022, addressed the Section 3553(a) factors in more detail, focusing on the severity of Granados-Corona's detention, which he alleged included violence by arresting officers in Mexico and harsh conditions in the Mexican prison where he had been detained until his extradition to the United States. (A. 67-68). The defense letter also argued that Granados-Corona's co-defendants and other similarly situated defendants had been sentenced to terms of imprisonment below the Guidelines range applicable here. (A. 69). The letter reiterated Granados-Corona's request for a sentence of the mandatory minimum 180 months' imprisonment. (A. 71).

29.     The second supplemental defense sentencing letter, filed on September 9, 2022, submitted educational and religious certificates that Granados-Corona had received while incarcerated. (A. 72-89). The certificates, the defense argued, reflected Granados-Corona's "efforts to better himself while incarcerated through continuing spiritual and secular education," and further supported Granados-

Corona's request for a below-Guidelines sentence. (A. 72).

30.    At sentencing, both parties agreed that the applicable Guidelines range was the same as set forth in the Plea Agreement: 235 to 293 months' imprisonment. (A. 138). Granados-Corona's counsel argued for a mandatory minimum sentence, based in part on the conditions of Granados-Corona's confinement in Mexico and in the United States. (A. 138-42).

31.    Victim-10 attended the sentencing and made a victim impact statement. (A. 143-49). She described how Granados-Corona had met her when she was just 16, had used lies, threats, and violence to get her to engage in commercial sex work, and had left her with lasting physical and mental injuries. (A. 143-48). Victim-10 asked the District Court to impose "the maximum sentence allowed." (A. 148).

32.    The Government, in its sentencing remarks, argued that a mandatory minimum sentence of 180 months' imprisonment would be inadequate for numerous reasons, including that it was less time than Granados-Corona had spent trafficking victims. (A. 151). Based on the extreme seriousness of the offense, Granados-Corona's role, and the need for deterrence, the Government requested a Guidelines sentence. (A. 152).

33.    Judge Carter asked the Government about the conditions of Granados-Corona's confinement in Mexico. (A. 153). The Government responded that it lacked information to corroborate or dispute Granados-Corona's claims about those

conditions, and acknowledged that the District Court could consider Granados-Corona's conditions of incarceration in fashioning an appropriate sentence. (A. 153).

34.    In his own remarks, Granados-Corona apologized for his actions and discussed the hardships of being incarcerated during the COVID-19 pandemic. (A. 154-56).

35.    Before imposing sentence, Judge Carter asked whether Granados-Corona was satisfied with his legal representation; Granados-Corona responded, "Yes." (A. 161).

36.    Initially, Judge Carter announced that he intended to impose a sentence of 228 months' imprisonment, explaining that such a sentence would be appropriate given the "strong need for punishment and a need to promote respect for the law and a need for general and specific deterrence," the "severe trauma" endured by Granados-Corona's victims, and, in mitigation, Granados-Corona's conditions of confinement. (A. 162-63). But after defense counsel asked Judge Carter to credit Granados-Corona for the 18 months he spent in custody in Mexico (A. 167), Judge Carter amended his sentencing decision downward by 16 months:

> I will modify the sentence to give him a lot of credit for the time that he spent in Mexico .… I am not going to give him credit for all 18 months in terms of the sentence, but I will credit him for 16 months of that 18 months and I will reduce his sentence to 212 months. So, the variance is based on the conditions of confinement that he has faced in Mexico and in the United States, as well as the time that he spent in Mexico awaiting extradition."

(A. 171-72).

37.     In addition to the term of 212 months' imprisonment, the District Court imposed a five-year term of supervised release, restitution to victims of $2,004,450, a special assessment of $100, no fine or forfeiture, and a consented-to order of judicial removal. (A. 161-64).

## ARGUMENT

### Granados-Corona's Appeal Should Be Dismissed Because He Knowingly and Voluntarily Waived His Right to Appeal

38.     As discussed above, Granados-Corona pleaded guilty pursuant to a Plea Agreement in which he expressly waived his right to appeal, among other things, a term of imprisonment within or below the stipulated Guidelines range of 235 to 293 months' imprisonment. (A. 43). During his plea proceeding, Granados-Corona affirmed his understanding that, as long as he was sentenced to a term of 293 months or less, he was agreeing not to appeal or otherwise attack his sentence. (A. 124). Because Granados-Corona's waiver was knowing and voluntary, and because Judge Carter sentenced Granados-Corona to substantially less than 293 months' imprisonment, this appeal should be dismissed.

39.     As discussed below, Granados-Corona has not set forth any basis to set aside the valid appeal waiver in the Plea Agreement. The waiver should therefore be enforced.

14

## A.    Applicable Law

40.    This Court has repeatedly held that a defendant's knowing and voluntary waiver of the right to appeal a sentence is generally valid and enforceable. *See*, *e.g.*, *United States v. Borden*, 16 F.4th 351, 354 (2d Cir. 2021); *United States v. Coston*, 737 F.3d 235, 237 (2d Cir. 2013); *United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011); *United States v. Buissereth*, 638 F.3d 114, 117-18 (2d Cir. 2011); *United States v. Lee*, 523 F.3d 104, 106-07 (2d Cir. 2008); *United States v. Gomez-Perez*, 215 F.3d 315, 318 (2d Cir. 2000); *United States v. Djelevic*, 161 F.3d 104, 106-07 (2d Cir. 1998). In fact, this Court has stated that "in no circumstance may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement." *United States v. Pearson*, 570 F.3d 480, 485 (2d Cir. 2009).

41.    This rule "recognizes that plea agreements can have extremely valuable benefits to both sides—most notably, the defendant gains reasonable certainty as to the extent of his liability and punishment, and the Government achieves a conviction without the expense and effort of proving the charges at trial beyond a reasonable doubt." *United States v. Morgan*, 386 F.3d 376, 380 (2d Cir. 2004). For an appellate waiver to be enforceable, the record must "clearly demonstrate[] that the waiver was both knowing (in the sense that the defendant fully understood the potential

15

consequences of his waiver) and voluntary." *United States v. Ready*, 82 F.3d 551, 557 (2d Cir. 1996). The knowing and voluntary nature of the waiver can generally be established by demonstrating that during the Rule 11 plea hearing, the defendant's attention was drawn to the waiver provision in the plea agreement. *Id*.

42.     The "exceptions to the presumption of the enforceability of a waiver" are exceptionally limited and "occupy a very circumscribed area of [this Court's] jurisprudence." *Gomez-Perez*, 215 F.3d at 319. This Court has declined to enforce such waivers "only in very limited situations, 'such as when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, when the government breached the plea agreement, or when the sentencing court failed to enunciate any rationale for the defendant's sentence.'" *United States v. Arevalo*, 628 F.3d 93, 98 (2d Cir. 2010) (quoting *Gomez-Perez*, 215 F.3d at 319).

43.     Accordingly, this Court has continually "upheld waiver provisions even in circumstances where the sentence was conceivably imposed in an illegal fashion or in violation of the Guidelines, but yet was still within the range contemplated in the plea agreement." *Gomez-Perez*, 215 F.3d at 319; *see also, e.g.*, *United States v. Rosa*, 123 F.3d 94, 97 (2d Cir. 1997) ("This rule has been held to bar even those appeals which claim that the sentencing court illegally sentenced the defendant under the Guidelines and relevant statutes, so long as the court nevertheless imposed

16

a sentence within the range outlined in the agreement."); *United States v. Yemitan*, 70 F.3d 746, 747-48 (2d Cir. 1995) (rejecting claim that waiver was "unenforceable because the district court's sentence was illegal" in light of court's failure to explain sentence as required by 18 U.S.C. § 3553(c)(1)). In *Buissereth*, for example, this Court enforced an appellate waiver despite finding *multiple* procedural errors at sentencing. The Court found that the sentencing judge had failed to: rule on objections to the presentence report; rule on requests for downward departures and a variance; adopt the findings of the presentence report; "mention, much less articulate its consideration of, the relevant factors set forth in 18 U.S.C. § 3553(a)"; or calculate an applicable Guidelines range. *Buissereth*, 638 F.3d at 117. This Court nonetheless enforced the appellate waiver, concluding that the case did "not present such an extraordinary circumstance" as to render the sentence "'fundamentally unfair.'" *Id.* at 118 (quoting *Gomez-Perez*, 215 F.3d at 320).

44. This Court has "reject[ed] the notion that an appeal waiver becomes unenforceable simply because a defendant 'claims' ineffective assistance of counsel." *United States v. Monzon*, 359 F.3d 110, 118 (2d Cir. 2004). As explained in *Monzon*:

> [I]f the record on appeal shows that that [the ineffective assistance of counsel] claim lacks merit, the appeal should be dismissed because the waiver should be enforced. Similarly, if the merits of the ineffective-assistance-of counsel claim cannot be determined on the basis of the record on appeal, it is appropriate to enforce the appeal waiver and

dismiss the appeal. If the rule were otherwise, a defendant who secured the benefits of a plea agreement by, *inter alia*, knowingly and voluntarily waiving the right to appeal could escape the fairly bargained-for appeal waiver by the simple expedient of asserting an ineffective-assistance-of-counsel claim that had no merit. To find an appeal waiver unenforceable simply because the defendant makes the claim, where the record (a) indicates that the appeal waiver was knowing and voluntary and (b) does not show merit in the ineffective-assistance-of-counsel claim, would render the plea bargaining process and the resulting agreement meaningless.

*Id.*; *see also United States v. Oladimeji*, 463 F.3d 152, 155 (2d Cir. 2006) ("As the record does not permit assessment of the claim of ineffective assistance and its potential effect on the appeal waiver, the defendant's undertaking not to appeal will be provisionally enforced as to any appellate claim that falls under the appeal waiver, unless and until he prevails (by a habeas petition) in proving that his appeal waiver should be voided because he received ineffective assistance of counsel.").

**B.     Discussion**

<u>Granados-Corona's Waiver Was Knowing and Voluntary</u>

45.     Granados-Corona does not claim—nor could he—that the Government breached the Plea Agreement.

46.     Moreover, the record makes clear that Granados-Corona knowingly and voluntarily executed an appellate waiver as part of the Plea Agreement. (A. 43, 124). At the outset of the plea proceeding, Granados-Corona was placed under oath. (A. 108). During the plea proceeding, Judge Carter specifically allocuted Granados-

Corona regarding the waiver-of-appeal provision in the Plea Agreement, and ensured that Granados-Corona understood the rights he was giving up. (A. 124). Granados-Corona confirmed that he understood he had "agreed not to file a direct appeal or bring a collateral challenge of any sentence within or below the guideline range of 235 to 293 months in prison." (A. 124); *see also Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (noting that "[s]olemn declarations in open court carry a strong presumption of verity"). Granados-Corona does not claim that counsel was deficient in connection with the appeal waiver itself. *See Monzon*, 359 F.3d at 118-19. Thus, Granados-Corona's waiver was knowing and voluntary, and he does not claim otherwise.

47. This case does not fit within any of the recognized exceptions to the enforcement of appeal waivers. To consider the merits of Granados-Corona's appeal on these facts would subvert the plea-bargaining process. *See Pearson*, 570 F.3d at 485.

### Granados-Corona's Arguments Do Not Invalidate the Waiver

48. Granados-Corona raises three issues on appeal: (1) whether the appeal waiver in the Plea Agreement should be enforced; (2) whether the district court erred in failing to vary downward a full 18 months, rather than 16 months, for the time spent in Mexican custody; and (3) whether Granados-Corona received ineffective assistance of counsel. (Br. 9). But Granados-Corona's arguments provide no basis

to invalidate the Plea Agreement's appellate waiver.

49.    Granados-Corona's brief concedes that appellate counsel, after examining the waiver in the Plea Agreement and the record, has not identified any contractual or constitutional defect in the appeal waiver, has not identified any reason that the waiver should not be construed strictly, and has not identified any reason under Federal Rule of Criminal Procedure 11 that the waiver should not apply. (Br. 29-31). The waiver is valid, and it should be enforced.

50.    As to the claim that the District Court should have varied downward an additional two months, the defense brief argues only, without elaboration, that the issue is "a question of such importance that disregard of the waiver is justified." (Br. 32). It is not. Indeed, in arguing that Judge Carter should have exercised his discretion to reduce the already below-Guidelines sentence he intended to impose by 18 months instead of 16 months, Granados-Corona's brief on appeal does not assert that the resulting sentence was even procedurally or substantively unreasonable (Br. 34-37)—which itself would not be sufficient to invalidate the appeal waiver, *see, e.g.*, *Buissereth*, 638 F.3d at 117-18 (dismissing appeal pursuant to waiver despite multiple procedural errors at sentencing); *United States v. Martinez*, 851 F. App'x 269, 270 (2d Cir. 2021) (dismissing substantive-unreasonableness claim where defendant's 600-month sentence was within term contemplated in plea agreement's appellate waiver).

51.    Finally, although the defense brief states that "[i]t may well be that Efrain Granados-Corona received ineffective assistance of counsel," it concedes that "there is no way to establish that" on the existing record. (Br. 38-39). Accordingly, the defense brief further concedes, the issue of ineffective assistance of counsel is not ripe for review. (Br. 39). The appellate waiver should therefore be enforced. *See Oladimeji*, 463 F.3d at 155.

## CONCLUSION

52.    Granados-Corona's waiver of his right to appeal should be given effect, and his appeal should be dismissed.[2]

Dated:      New York, New York
            July 11, 2023

                              /s/ Jacqueline Kelly
                              Jacqueline Kelly
                              Elinor Tarlow
                              Assistant United States Attorneys
                              Southern District of New York
                              Telephone: (212) 637-2456/ 1036

---

[2] Should the Court deny this motion, the Government respectfully requests 60 days from the date of that denial to file a response to Granados-Corona's appeal.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this motion complies with the type-volume limitation of the Federal Rules of Appellate Procedure. As measured by the word processing system used to prepare this motion, there are 4,463 words in this motion.

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By:    Jacqueline Kelly
Assistant United States Attorney
(212) 637-2456